BURNHAM *v.* KEMPTON.

If the owner of the land on one side of a river erects a mill-dam across the river, and abuts the same upon the opposite shore, and continues and maintains the same in that position for twenty years, that would be evidence of a grant or right to build and maintain such a dam, constructed and used substantially in the same manner:

But it is not evidence of a right to appropriate all the water-power that might be created by such dam to the use of the person who thus built and maintained the dam.

A dam is an instrument for turning water to the use of a mill, as a bulk-head is the means of drawing the water from a dam, but neither may in fact have been used for either purpose at all, or if at all, in any such way as to change or affect the original rights of the riparian owners on either side.

Twenty years' use of the water of a stream in a particular way is evidence of a right thus to use the water.

The same proof of user which establishes the right, is equally conclusive in establishing the limitations of that right.

Want of equity is not only good ground of demurrer to a bill, but is a good ground of defense where no case is established upon the merits, and this includes cases where the plaintiff's right proves to be one at law and not in equity.

Ordinarily, courts of equity will exercise a concurrent jurisdiction with courts of law in cases of private nuisance, only when they can restrain irreparable mischief, suppress interminable litigation, or prevent a multiplicity of suits;

And, in such cases, courts of equity will not ordinarily take upon themselves to decide the fact that a nuisance exists, when that fact is controverted, but will require that the party asking the interference of the court shall first establish his right at law.

But in some cases, where a party has been long in the quiet and uninterrupted enjoyment of a right, or where the injury threatened would be irreparable, another party will be restrained from interfering with that right, or doing that injury, until he establishes his right at law.

Nor does that large class of cases involving an inquiry into the rights of the owners of water power, in connection with mills and machinery, stand upon grounds substantially different in these respects from other cases of private nuisance.

Where the rights of several owners in the same water-power or privilege are admitted, or have been established at law, a court of equity will entertain jurisdiction to regulate the use of the water, and to fix and establish the extent of their respective rights, so as to give each proprietor or owner the just proportion of water to which he is entitled.

But a court of equity will not entertain jurisdiction of a cause under any pretense of adjusting rights in common to water-power, when it is apparent that all that is sought by the parties, or either of them, is to settle and establish a disputed right, for the establishing of which the parties have a plain and perfect remedy at law.

In Equity. The bill is stated in 37 N. H. 485. The defendants at first demurred to the bill, but the demurrer was overruled for reasons fully appearing in the former opinion. The court in that opinion confine the effect of that decision to "the present stage of the case;" thereby clearly intimating that they did not intend to decide any case that might afterward arise, provided the answers and proofs should in any way change the aspect of the case from what it thus appeared upon the bill itself.

Since that opinion was delivered the bill has been amended by introducing other parties, and the defendant Kempton has filed his answer, as has also Mr. Perkins, who is now made defendant with Kempton, he having taken back the premises since the bill was filed, which he had formerly sold to Kempton, and upon which he held a mortgage to secure the purchase money. And these answers agree substantially, as far as both are conversant with the facts, in denying that the plaintiffs have now or ever had any exclusive right to use the water in said dam, but claim that the defendants on the north side of the river now have and hold all their rights to the use of one half the water in said river, which they would hold as riparian proprietors and owners of the land; that none of these rights have ever been granted to the plaintiffs, or acquired by them by prescription, or in any other way. They admit that since 1784 the plaintiffs have maintained the dam, as alleged, but claim that since 1825 the defendants, and those under whom they claim, have kept up and maintained a bulk-head near the north end of this dam, through which water has been drawn to supply mills and machinery on the north side of the river, and claim the right to draw at the present time one half the water of said river for the use of said mills and machinery.

The defendants also claim the right to draw from the plaintiff's dam, in addition to one half the water of the river, the additional quantity of two hundred and fourteen inches of water-power from

said dam, and use it on the north side of said river, under a deed from Abraham Brown to Ephraim Fisk, dated March 17, 1851, in which said Brown conveyed to said Fisk a certain tract of land, with the mill and water-power thereon, on the south side of the river, describing the land by metes and bounds, and "including in said water-power the privilege to draw two hundred and fourteen inches of water-power;" which premises the defendants now own. They admit that Perkins made the contract with the plaintiffs in 1832, as alleged, and that he built his new dam mentioned in said contract, and that the plaintiffs performed their part of said contract. They allege that the defendants drew water from this bulk-head till 1856, when the dam was extended to the northerly shore.

They admit that they did open the plaintiff's dam for a space of about four feet, where the old bulk-head was, or a part of it, but that it was done without endangering its safety, and with as little injury as possible, and that it was done for the purpose of enabling the defendants to draw the water they needed for their said mills on the north side of said river, under their right as riparian owners, and their additional right under the deed from Brown to Fisk; but deny that they took any more water than they had a right to, or that said opening in the dam hindered or prevented the plaintiffs from running their mills, &c.; and, although Burnham has stopped up the same, yet the defendants claim that they have the right to open the same at pleasure, for the purposes aforesaid.

There was a general replication, and the cause was heard upon the bill, answers and proofs.

*Morrison & Stanley*, for the plaintiffs.

The material matters contained in this bill are well stated by the court in this case, in 37 N. H. 485. It was then before the court upon a general demurrer, which, in the most important points, was overruled. The court have there held, that upon the case, as then presented upon the bill, some additional parties being joined, the complainants were entitled to the relief prayed for. The defendants have then filed their answers, Kempton denying, upon information and belief, all of the material allegations of the bill, and Perkins denying, upon his own knowledge, all of the material allegations of the bill except the execution of the obligation, set out in the bill, which he admits; and he also sets up a claim to one half of all the water of the river above the Burnham dam, and also claims the right to draw from any point in the Burnham dam, two hundred and fourteen inches of water, under a head of about seven feet.

The court having already settled that, upon the case, as presented in the bill, the complainants are entitled to the relief sought, and the material matters being put in issue by the defendants, it becomes important to inquire, in the first place, how far the allegations of the bill are sustained by the evidence.

It will be seen, by the abstract of the evidence which we have given, that all the material allegations contained in the bill are sustained. The evidence shows, fully and conclusively, as we submit,

that Perkins or Kempton not only never had any right to use the water in the Burnham dam, but that Perkins himself never claimed any such right until twenty-two years after the obligation set out in the bill was made, and that he not only did not claim any such right, but he publicly declared that he had no such right.   But, were there no such declarations of his to that effect, we submit that his acts and conduct are the strongest evidence.   Why, if he had, as he claims in his answer, the right to one half of the water, ask permission of Burnham to cut a hole in his dam ? why direct it to be closed as soon as the logs were put through ? why offer to put a lock upon the gate and let Burnham keep the key ? why allow his mills to stand still from one fourth to one half the time ?   If he had the right to one half of the water he had a right to have an aperture in Burnham's dam sufficient to draw it.   Above all, if he did not, when he built his dam, understand that he had no right to the water in the Burnham dam, and that the obligation he gave to Burnham and others gave them, as it purports to do, the right to connect with the north bank of the river, and thus to cut him off from the use of all the water except such as wasted over the Burnham dam, why did he build it in the manner it is built?   If he then understood that he had the right to draw the water from the Burnham dam, why not place his saw-mill at the north end of it, and then put in a canal, as he did after he had built his dam ?   It seems to us that this fact goes very far to show that at that time he understood that he had no right except to the waste water.   He says in his answer that the parties to the obligation of August, 1832, contributed to building his dam for the security it would afford to theirs, and to save the necessity of graveling it.   Is he borne out in this statement by the evidence ?   Clearly not.   It appears from all the evidence that the complainants have graveled their dam nearly every year since its construction in 1831, and that, too, through its whole length.   This fact shows conclusively how the complainants and those under whom they claim understood the obligation of August, 1832, and how they acted upon it.   If they had understood it as Perkins now claims, would they have graveled and tightened the dam nearly every year after its construction. Certainly not.   There would have been no necessity for it.   That part of it extending from the intersection of the Perkins dam with it, would not have required any repairs ; Perkins keeping his dam of the same height with theirs, and keeping it in repair, as he has done without assistance from the complainants, could have drawn his proportion of the water, as he now claims he has the right to do, and they would have enjoyed all their rights at a much less expense.

Taking then into the account the acts and declarations of Perkins, and of the complainants, and those under whom they claim, as disclosed in the testimony of fifteen reliable witnesses, many of whom were employed by Perkins and worked in his mills, the situation and manner of construction of the two dams, as shown by the plan which is introduced on the part of the complainants, and also the fact that of the whole number of witnesses produced upon

the part of the complainants, not a single one is cross-examined upon any material point, and only two cross-examined at all, although Perkins himself was present during the caption of the whole testimony; also the fact that he has taken no evidence bearing upon the material points; thus, as we contend, admitting the truth of the complainants' story; also, that up to 1854 he never claimed any such right as he · now claims; we submit that the . complainants, notwithstanding the defendants' answer, have made a case, clear and beyond all question, as full and as strong as that stated in their bill, and upon the authority of this case in 37 N. H. 485, they are entitled to the relief which they seek.

But the defendant sets up that, being an owner of a mill and privilege on the south side of the river, with the right to draw water through an aperture containing two hundred and fourteen square inches, under a head of seven feet, he has the right to take as much water as would be discharged through an aperture of that size from any part of the Burnham dam. As a matter of fact, we say, he never understood, up to the time this bill was filed, that he had any such right. As a matter of law we contend that this position is not well taken. His deed neither does or can give him any right to use his water-power in any way but in connection with the mill-privilege conveyed to him. The power is an incident or appurtenant to the land, and must be used in connection with it. It is a well established maxim of law that one should so use his own as not to injure his neighbors. " *Sic utere tuo ut alienos non lœdas.*"

*Perley* (with whom were *George & Foster*, and *Perkins*), for the defendants.

I. A court of equity has no jurisdiction of the case as it now stands on the answers and evidence.

1. The right of the plaintiffs to connect their dam with the north shore, for the purpose of using that half of the water which belongs to the land-owners on the south side, is not now denied by the defendants, and never has been. That right is not in controversy. But the plaintiffs set up a claim to the exclusive use of all the water-power created by the dam, and this claim the defendants deny and resist. The plaintiffs produce no conveyance from any owner on the north side, and undertake to maintain their . claim by an adverse usage, constituting a prescription, which would imply a grant. The title set up by the plaintiffs is, therefore, purely legal in character, and if it were supported by their evidence they could maintain a suit at law for diverting the water, and for every other infringement of that legal right with which the defendants are charged in the bill.

There can be no pretense that the writing of August 13, 1832, conveyed any title, legal or equitable, to all the water. It was held, in the reported case of *Burnham* v. *Kempton*, 37 N. H. 485, that the writing might be held to give an equitable, though not the legal right, to continue the connection of the dam with the north shore, and might be regarded as evidence of an existing equitable

right so to connect the dam. But it can not be contended that this writing conveys, or attempts to convey, any new title, legal or equitable, to the water power of the river. At most it does no more than recognize existing rights; and if the mill-owners on the south side had any right beyond what belonged to them as riparian proprietors, that was obtained by continued adverse use, which would give them a legal title by prescription.

The title, therefore, under which the plaintiffs set up this claim to the exclusive use of the water, is a purely legal one, and not a mere conscientious and equitable right, like that which was considered in the reported case as it stood on demurrer, recognized only in equity, and the plaintiffs are not driven into equity because the courts of law would refuse to consider their title.

The nature of the plaintiff's title, as it appears in this hearing, has, therefore, nothing in it that can give a court of equity jurisdiction. It has no legal infirmity which drives them into equity for relief.

2. The right set up in the bill is controverted and denied by the answers, and in evidence, and has not been tried and determined in a suit at law.

The remedy for an injury like that which is the real subject of complaint in this cause, is at law. There is nothing in the nature of the plaintiff's right, or of the injury, to call for the interposition of a court of equity to give relief by the summary proceeding of an injunction. When, however, a water right has been tried and established in a suit at law, and the defendant has contumaciously persisted in violating it, a court of equity will interfere to protect the right thus established, to prevent the necessity of successive and repeated suits at law, and to relieve the plaintiff from oppressive litigation. This is a distinct head of equity jurisdiction. They do the same in England, for the same reason, when the title to land has been tried at law in trespass and ejectment.

In this case there has been no trial at law, and the court can not assume jurisdiction, on the ground last suggested.

3. No injury has been done or meditated by the defendants, of a character to call for the interposition of equity. Even admitting that the plaintiff's right to the exclusive use of the water is proved on a balance of the evidence against the natural right of the proprietors on the north side, and the positive denial of the answers, still no such damage has been done or threatened as can oust the courts at law of their exclusive jurisdiction, and warrant equity to interfere and conclude the title by the summary process of injunction. For the statement of the bill, that the defendants have done or threatened acts which endanger the safety of the dam, and might thereby cause irreparable damage, not capable of compensation by damages recoverable in a suit at law, is wholly unsupported by the facts, as they appear on this hearing. We do not perceive the slightest attempt to maintain in argument this part of the case stated in the bill.

There is nothing in the character of the river or dam, or any of the circumstances, which can give the smallest countenance to the

pretense set up in the bill, but abandoned in argument, that this bulk-head, or any other that the defendants purpose to make there, would cause the least danger or do the slightest injury to the dam.

It is quite clear that the sole controversy between the parties is as to the right which the complainants set up against the owners on the north side, to the exclusive use of all the water; and the only injury for which the plaintiffs seek redress is the diversion of the water which they claim. This controversy is of a purely legal character; the remedy complete at law; and the case shows nothing in the nature of the injury complained of which requires that the plaintiff should have relief by injunction.

4. Then, again, we say, and shall maintain under another head, that if the court should enter upon an examination of the controverted facts, the plaintiffs have failed, on a balance of the evidence, to prove the title which they set up, of an exclusive right to all the water of the river.

The authorities establish the rule beyond question, that, whatever the nature of the injury complained of may be, equity will not undertake to settle a legal title, controverted in a case like the present, and conclude the rights of a defendant by a perpetual injunction. 3 Danl. Ch. Pr., 1900; *Roath* v. *Driscoll,* 20 Conn. 533.

No irreparable damage is threatened which gives occasion for equity to interfere by injunction.

This right set up by the bill is denied by the answers, and has not been established in a suit at law, and equity is not called on to interfere by injunction in aid of the jurisdiction at law, to prevent the necessity of repeated suits and oppressive litigation.

The authorities are clear and decisive that a court of equity has no jurisdiction to determine such rights, in a case like that which appears on this hearing, until the title has been considered, established and defined in a suit at law. The uniform current of authority is so, and our own recent and very fully considered case of *Coe* v. *The Lake Company,* 37 N. H. 254, is conclusive on the point. The case of *Burnham* v. *Kempton* very clearly recognizes the same doctrine; for it is very plain that the court would have declined jurisdiction if no question had been raised on the demurrer, except the legal right to the water and the mere damages for diversion of it. The bill claimed a right to connect the dam with the north shore, under a writing which gave an equitable but no legal right, and also stated a case of irreparable damage; and on these grounds, which both disappear on this hearing, the jurisdiction was sustained; and there is a clear inference from the whole case that it was on these grounds only that the court entertained jurisdiction.

II. Perkins, under the deed from Abraham Brown to Ephraim Fisk, has the right to draw his two hundred and fourteen inches of water from any part of the dam, and by a bulk-head on the north side. The grant is, "to draw two hundred and fourteen inches of water-power."

The general rule on the subject we take to be this: "Where one has a right to a certain quantity of water, which is used at the time of his purchase for a particular purpose, and at a particular place,

he may change the manner of use, or the place at which it is taken and used, unless the change would be in violation of an express provision in the deed, provided the change does not increase the quantity of water taken.    *Bullen* v. *Runnels*, 2 N. H. 255, 263 ; *Johnson* v. *Rand*, 6 N. H. 22 ; *Whittier* v. *Cochecho Manf. Co.*, 9 N. H. 454 ; *Saunders* v. *Newman*, 1 Barn. & Ald. 261 ; *Tyler* v. *Wilkinson*, 4 Mason 404 ; *Hurd* v. *Curtis*, 7 Met. 94 ; *Tourtelot* v. *Phelps*, 4 Gray 370 ; *De Witt* v. *Harvey*, 4 Gray 486 ; *Rood* v. *Johnson*, 26 Vt. 64 ; *Fisk* v. *Wilbur*, 7 Barb. S. C. 395.

In *Whittier* v. *Cochecho Co.*, the doctrine is thus stated by *Parker*, C. J. : " The plaintiff's rights are no more prejudiced by the defendants opening their gates and using the water, three miles below, provided they use no greater quantity, than they would be in the change of the use at that place.    It is immaterial to the plaintiff at what spot the defendants apply the water to the wheel, or what machinery that wheel turns, so long as they do not exceed their rights in the quantity they use."    These remarks apply in their full force to the present case.

The general doctrine for which we contend on this part of the case, is as old as Luthel's Case, 4 Co. 86.    The authorities in this State, especially *Whittier* v. *Cochecho Manf. Co.*, appear to be very exactly in point.    No ground is found in the case for supposing that the plaintiffs can suffer the smallest injury from changing the place of taking the water, as we propose ; and the maxim, " *sic utere tuo*," &c., has no application.

III. The plaintiffs have not established the right of the mill-owners on the south side to all the water of the privilege.

We do not insist that the court shall enter on an investigation of this point, for the purpose of establishing in this suit our right to that half of the water which belongs to the north side, because we think that the case, as it now stands on the answers and evidence, gives them no jurisdiction of the·question.    But we contend that if the evidence on this part of the case is considered, it does not make out the right set up by the plaintiffs ; certainly not in any such satisfactory and conclusive way as will induce a court of equity to take the question from a trial at law, where it properly belongs, and decide finally on the legal rights of the defendants by this summary proceeding of a perpetual injunction.

The dam, as the claim is stated in the bill, belongs to the mill-owners ; it has been maintained by them, and must be supposed to have been originally built by the owners of the first mills.    Nothing in the case leaves it to be inferred that the dam was originally built or has been maintained by the land-owners on the south side. If the owners of the saw-mill and grist-mill, having a claim to water for those mills, built the dam to the north shore, they had no title which would give them a colorable right to all the water.    The dam from the beginning has been used, as is stated in the answers and appears in the case, by the owners of different mills, using each separately a certain limited amount of water power, and having no title or claim to more.

We say, then, here is no pretense that the dam was put across

the river or has been maintained since under an implied claim to more water than was actually used; because those who made and used the dam had no colorable title to more than they actually used.

In this case, therefore, extending the dam to the north shore can not be understood as the assertion of a claim to all the water. They had no color of title to all the water, and the use they made of the water was limited to their respective mills, and they must be understood to have made and maintained the dam to take water for the use of their own works only, and can not be supposed to have made a more extensive claim.

The water which rightfully belonged to the south side could not be used without extending the dam to the north side; and a license or a grant to connect the dam there would not imply leave or right to take all the water; nor would the continual connection of the dam there imply any grant of all the water by prescription.

In 1825 Towne owned the land on the north side, and owned half this water-power, unless he had lost it by an adverse use of the mill-owners on the other side. He then put in a bulk-head on the north side, to draw water, and as early as 1828, Flanders, his lessee, drew water from the bulk-head for his mill. Towne claimed as riparian proprietor; he had no other title, and there was nothing to limit this claim; he had a right to half the water or to none. When, therefore, he opened the bulk-head, he, by that act, asserted his right to half the water, and this would prevent a prescription from running against his right. If the mill-owners on the south side have the right to all the water, they must claim it by an adverse usage of twenty successive years before, or of twenty successive years after this act of Towne asserting his right as owner on the north side. They can not unite any usage before to the usage after this act to make up the twenty years.

There is no evidence in the case on which the court can rely to show that for twenty years previous to 1825 all the water of the river had been used and claimed by the mill-owners on the south side, with the acquiescence of the riparian proprietors on the other side.

The conduct of the parties on both sides is entirely inconsistent with the notion that such a claim was admitted or asserted. Towne, in 1825, opened the bulk-head, and as early as 1828 leased a water-power and a mill supplied by water through the bulk-head from the old dam. New works were added on the north side, all wholly carried by water from the old dam down, to 1835, when the Perkins dam was built; and not by surplus water which ran over the dam, but by water taken from it through a bulk-head and flume, just as the water was taken on the south side. And this bulk-head remained there, though, after the Perkins dam was built, not necessary to be constantly used, till Burnham wrongfully shut it up in 1840. Such was the claim asserted on the north side for ten successive years at least, without objection or denial from any quarter.

The mill-owners built over their dam in 1831, while the bulk-head was in the dam, and in use; and instead of disturbing or question-

ing the right to the bulk-head and flume, and the use then made of them, they built their new dam with the bulk-head remaining in.

We rely, also, on the writing of August, 1832, for a very distinct recognition of our right to water from the dam; for when that writing was made the bulk-head, flume and water-gates were there and in use, to carry the works on the north side; and instead of asserting, in that transaction, the right to all the water raised by the dam, the mill-owners on the south side, as part of the bargain, stipulate for leave to continue the connection of their dam with the north side.  The language used is : " And it is admitted that the present mill-owners may continue to connect their dam with the bank on the west side of the river as long as they see fit." The court have held in a former case that this writing gave them an equitable though not a legal right to continue the connection.  How can it be supposed that, under this stipulation for leave to continue the connection, it was understood that they might so change the connection as to destroy the use, which the defendants then had, of the dam ? It is plainly implied that the manner of connection should continue the same, and not be changed to the injury of any party.  The existing state of things is recognized by all the parties to the writing.  The bulk-head, gates and flume were there, and used to take water from the dam ; and the right to have them continued there, for the same purpose, was recognized by the writing.

Then, again, between 1825 and 1835, important works were built on the north side, and carried all that time by water from the dam. The arrangement of 1832 was made while those works were in progress, and all these investments are worthless if this claim to all the water should be sustained ; for the mill-owners are under no obligation, on the ground they take, to allow even the surplus water, which they can not use, to escape over their dam into the wing dam below.  They may construct their dam so as to have it all pass over next their shore, and leave it to waste down the stream.

If the proprietors on the north side had not lost their natural right to half the water when Towne first asserted his title, they certainly have not lost it since ; for they continued the bulk-head in the dam until 1840, when Burnham first closed it, and used water from the dam for all their works till 1835, without any aid from the Perkins dam then built.  If they had a right to a bulk-head and to take water there in 1835, they have not lost the right by adverse usage and acquiescence since ; for, even admitting that the loose and suspicious evidence here introduced of admissions and statements by Perkins can be received as proof that he acquiesced in this claim at any time, it certainly does not show that he acquiesced for twenty successive years.  He opened the old bulk-head in 1850, 1852, 1854, and 1857, claiming the right to it and to take water by it ; and any amount of admission and acquiescence for a period short of twenty successive years, could not deprive him of his legal right.

The plaintiffs claim the right to an exclusive use of all the water stopped by the dam, and ask the court, on the case now before them, to investigate and settle finally the rights of the parties, and

conclude the defendants by a final decree, awarding a perpetual injunction. They claim this right by prescription, and show no other title. The effect of such a decree would be to leave all the works on the north side entirely at the mercy of the plaintiffs. The defendants claim the right to reopen the old bulk-head, shut up first in 1840 by Burnham, and to take water for their works as they did down to 1835; and also claim the right to take their two hundred and fourteen inches of water on the north side, where the old bulk-head was. We submit that the bill must be dismissed.

1. Because the questions in dispute on this hearing are of a purely legal character, and do not belong to the jurisdiction in equity; and there are no peculiar grounds of equity jurisdiction, either in the title or the remedy required.

2. Because we have the right, under the deed from Brown to Fisk, to take our two hundred and fourteen inches of water-power from the north side, and to reopen the old bulk-head, or make a new one for that purpose.

3. Because the plaintiffs have not made out their prescriptive title by any such evidence as will warrant a court of equity to interfere by the summary process of a perpetual injunction, and thus withdraw the consideration of this disputed title from a trial at law, where it properly belongs.

SARGENT, J.  It appears that as early as 1784, and perhaps before, a mill-dam was erected across the Contoocook river, substantially where the present dam now stands, abutting upon the north bank, and forcing the whole water of the river to run over the dam or through the mill gates on the south side of the river. The evidence tends to show that until 1825, or about that time, there was no mill, bulk-head, gate, or opening of any kind in the north half of the dam, excepting a fish-way, which was opened and kept open under the laws of the State on that subject. There is no evidence of any grant of the right to maintain this dam, or any consent of the owners of the land on the north bank to the erection or maintenance of the dam, until the agreement of 1832, except that which results from an undisturbed possession of more than forty years.

It is, of course, a well settled doctrine of our law, that an adverse, exclusive and uninterrupted enjoyment for twenty years of an incorporeal hereditament, such as the right of maintaining such a dam would be, affords a conclusive presumption of a grant or right, as the case may be, which is to be applied as a *presumptio juris et de jure*, wherever by possibility a right can be acquired in any manner known to the laws; provided such enjoyment is under a claim of right, with the knowledge and acquiescence of the owner, and uninterrupted. *Wallace* v. *Fletcher*, 30 N. H. 434; *Bow* v. *Allenstown*, 34 N. H. 374. If the evidence should be found to establish this right, the result will of course be, that the owner of the north bank is for ever precluded to interfere with or impair such dam in any manner, independent of the agreement of 1832, unless he has, since 1825, acquired a right to do so by a like possession of a right to take away a part of the dam at the north end, and to place in it

and maintain there a bulk-head, or other right restricting and limiting the right of the owners of the dam.

A period of thirty-five years and more has now elapsed since 1825, when, as the defendants' evidence tends to prove, one Rodney Towne took away a part of the dam at the north end, and erected a flume, and a few years after permitted one Flanders to erect a small building over this bulk-head, and to place in it a clapboard machine, which seems to have remained till after the Perkins dam was built, when it was removed and placed upon the canal supplied by the Perkins dam.    The Burnham dam, having become ruinous and decayed, was rebuilt in 1831, from the flumes on the south side to the bulk-head erected by Towne on the north side, which was then in good condition, and was not disturbed; but the new dam was secured to it.

The Perkins dam was built in 1835, under an agreement between Perkins and certain owners on the south side, connecting at its south end with the old dam, and from that point stretching, like an oblique wing dam, to the north side, at a point about a dozen rods below the north end of the old dam.    The answers and the defendants' evidence tend to show that this bulk-head in the Burnham dam remained there twenty years and more, when it washed away, and the dam was continued to the north shore, but that Perkins has placed new ones there since.    The evidence tends to show that no objection was made to the erection or continuance of this bulk-head; and the same principle of law to which I have adverted may be again applied, and may, if the evidence is satisfactory, have given to the defendant (Perkins) the right to have and maintain a bulk-head in the plaintiffs' dam, of the same form and dimensions and in the same place as the old one.

But the right to maintain a dam on the one side, or a bulk-head on the other, are by no means identical, necessarily, with the right on either hand to use the water.    A dam is an instrument for turning the water of a stream to the use of a mill, as a bulk-head is the means of drawing the water from a dam; but neither may, in fact, have been used for either purpose at all, or if at all, in such a way as to change or affect the original rights of the riparian owners on either hand.

The evidence tends to show that, from the erection of the earliest dam at this place, there was a grist and saw-mill at the south end of the dam, and soon after 1784 (it does not appear from the evidence precisely when) a fulling-mill was erected, and the same substantially have been continued there to the present time, and the rights acquired by the owners of these mills prior to 1825, unless they have since been lost by prescription, are now owned by these plaintiffs, but in what proportions does not distinctly appear, nor is it now material.    It would seem from the evidence that, prior to 1825, these owners on the south side had acquired the exclusive use of all the water then necessary to carry the grist-mill and fulling-mill at all seasons of the year, and the saw-mill at such seasons, as saw-mills were, at that time, usually run, but subject to keep open a fish-way at the top of the dam, eight feet long by one foot

deep.   Statutes of N. H. (1797) 407, and Statutes of N. H. (1830)
243; Statutes of June Session, 1831; 21.

Assuming such condition of the rights of the parties in 1825, has Perkins acquired or lost any rights to the use of the water since? This will depend mainly on the evidence bearing on the use of the mills and the water, since the building of the new Burnham dam, in 1831, and the new Perkins dam, in 1835, as it would seem that all the mills had been erected and were in use prior to the last mentioned date.   The plaintiffs' evidence tends to show that during the seasons when the water in the river was abundant, more than enough for all the mills on both sides, the bulk-head or opening in the Burnham dam might sometimes have stood open for considerable lengths of time; but it also tends to show that Perkins' mill-pond was filled, and his mills carried by the water that flowed over the top of the Burnham dam; that some of his mills were operated during the season when the water of the river was low, and that when the water ceased to run over the dam, all the outlets were closed, and the whole water of the river was turned toward the south side of the river, to drive the mills there; that it was not until 1852 that Perkins began to claim that he was entitled to any part of the water in the Burnham dam, but that this claim was never yielded to, or in fact so exercised as to interfere with any rights of the owners on the other side.   But the evidence on all these points is uncertain, as might be expected, from the distance of time, and conflicting, because of the different positions of the witnesses, their interests and leanings, when their observations were made, as well as since.

The claim of the plaintiffs (if that is their claim) that the erection and maintenance of their dam for twenty years and upward gives them a right to the whole water-power created by the dam, does not seem to us to be well-founded.   That question substantially arose before the Supreme Court of Massachusetts in *Bliss* v. *Rice*, 17 Pick. 23; and it was there held that where the evidence justifies the jury in making the presumption that the owner of the bank of a river has granted to the owner of the opposite bank a privilege of abutting a dam on his shore, he is to be thereby presumed to have granted all the benefit, water-power and privilege, which would arise from or be created by the erection of the same; that the extent of the grant presumed is to be measured by the capacity of the dam, and not by the rise actually made of the water.   We find ourselves unable to assent to this doctrine.   To us it seems that twenty years' maintenance of a dam in a particular mode is evidence of a grant or right so to maintain it, and twenty years' use of the water in a particular way is evidence of a right thus to use the water.

The same proof of user which establishes the right is equally conclusive in establishing the limitations of that right.   Twenty years' accustomed flow and use of a certain stream or pond of water is as good evidence of right to the one party as to the other. Twenty years' support, subject to the qualifications before stated, of a mill-dam, is evidence of a grant to build and maintain just

such a dam, constructed and used substantially in the same manner. Twenty years' use of the water raised by such a dam, to drive a grist, saw, and fulling-mill, at all seasons, or at certain seasons, is evidence of a grant to use so much of such water as shall be necessary at those seasons to drive those mills or similar ones. It necessarily implies, also, a grant by the owner of the right to obstruct the stream by the dam, and to force all the water not used by these mills over the dam, and of course necessarily to limit the right of the riparian owner to such use as he may make of the water after it has passed over the dam.

In the case before us, if the owners on the south side had acquired the right to put their dam across the river, and to use all the water required to carry certain mills, this left Perkins at liberty to do precisely what he did in this case, that is, to erect a dam across the river as far as he could, without infringing on the rights of the owners on the south side, as high as he chose, and to turn the water to supply such mills as he chose to erect; and he had, to commence with, the same right to insist that the half of the water belonging to him as riparian owner, not required to supply those mills on the south side, should be allowed to run over the dam for his use, as they had to require the residue to run to their mills.   3 Kent Com. 442; *Balston* v. *Burstead*, 1 Camp. 463; *Bealy* v. *Shaw*, 6 East 208, 219; *Stiles* v. *Hooker*, 7 Cow. 266; Ang. on Water-Courses, sec. 224, and cases cited; *Watkins* v. *Peck*, 13 N. H. 360.

The evidence here tends to show that the amount of power required to drive the mills on the north and south sides at the present time is about equal; and it would also seem that there is, during a very considerable portion of the year, an ample supply of water for all. If that be so, then at all such times the water to which the proprietors on the south side are entitled as riparians, is more than all they use, and they do not then interfere in any way with the water to which the defendants are entitled as riparians, except in this, that they force it all to run over the top of their dam (excepting such part, if any, as the defendants may have the right to draw through a bulk-head, fish-way, or other opening in the dam). But in that stage of the water it is of little consequence whether the water runs over the dam or through a bulk-head, since it can only be available by means of the dam below. It is only during the low stages of the water, when the water is insufficient for all the mills, that any question can arise between the owners upon the two sides, as to their rights.

The owners on the south side claim that whenever the water becomes insufficient for all, they are entitled to draw from their dam water for all their mills, whether the mills on Perkins' dam get any or not, and that they have the right to close all openings in the dam, and make it as tight as possible, in order to secure it all, and thus, at such seasons, to use the whole water of the river for the benefit of their mills. The owners on the north side claim not only the rght to maintain a bulk-head in the Burnham dam at the north end of it, and to have it stand open in high water, but at low stages of the water, when there is not sufficient water for the mills

on both sides, they claim the right to draw from the Burnham dam whatever water will run through this bulk-head, whether it leaves sufficient water in that dam for the mills on the south side or not; and the only question now before us on the evidence is, as to the defendant's right thus to maintain his bulk-head, and thus to use the water in the Burnham dam.

The defendants object, that whatever the case may have been originally, as stated in the bill, and as admitted by the demurrer, in the first instance; whatever questions then arose that were proper subjects of inquiry in a court of equity; now, as the case stands here, upon the answers and proofs, it is not one where this court, acting upon the settled principles of equity practice, will decide the facts, or grant the relief prayed for. This objection is properly taken at this stage of the case. Want of equity is not only good ground of demurrer to a bill, but is a good ground of defense, when the case is established upon the merits; and this includes cases where the plaintiffs' right proves to be one at law, and not in equity. Adams Equity 331, and cases cited.

As the case now stands, no question is raised concerning the revocation of any license to the plaintiffs to maintain and continue their dam on the north bank of the river. It does not appear that the defendants have done or threatened to do any acts which could tend to weaken or endanger the connection of the plaintiffs' dam with the north bank of the river; nor does it appear that the plaintiffs tiffs ever had, or now have any reason to apprehend, or that they in fact apprehended any danger from any such cause. The allegations, therefore, that here was irreparable injury done or threatened, which could not be compensated in damages, are not proved, and upon that ground the bill can not be sustained. Neither, as the case stands, can any injunction be now granted, for on which side soever the evidence may seem to preponderate on any of the points raised, still the plaintiffs have not proved the allegations in the bill in relation to their rights to use all the water in the upper, or Burnham dam, so as to warrant this court now to interfere by the summary process of a perpetual injunction, according to the prayer of the plaintiffs' bill, and thus undertake to settle and establish the rights of the parties in this summary way. "To support a decree for a perpetual injunction, the court requires that there should be nothing like a doubt in the case." 3 Dan. Ch. Pr. 1700.

Though a court of equity has the necessary power to restrain a party in the use of water in a manner injurious to another, yet the court will not exercise this necessary authority where the right is doubtful, or the facts not definitely ascertained; it being the duty of the court rather to protect acknowledged rights than to establish new and doubtful ones. *Booth* v. *Driscoll*, 20 Ct. 555. We have not been asked in terms to grant any temporary injunction, so that the specific relief prayed for can not now be granted.

But it may be claimed that under the prayer for general relief, the court may take jurisdiction of the case, may settle the facts, or frame issues and send to a jury, so that they may settle all the disputed facts, if necessary; and that this court may, by a final decree,

fix and establish the rights of all parties to their legal and proper share of the water at the place in question.

Let us examine and see whether this court can properly exercise jurisdiction of this case for that purpose. The plaintiffs claim the exclusive use of all the water in the Burnham dam. Now if they have any such right, it has been acquired by prescription. But whether they have such right or not depends upon facts and principles over which equity has no peculiar jurisdiction. These rights, if they exist, may as well be established at law as in equity. There is nothing in the agreement of 1832 which can affect the right to use the water here, either at law or in equity; and the question in regard to the rights of maintaining the plaintiffs' dam, and continuing it upon the north bank of the river, or the right of the defendant to unite his dam with the plaintiffs' dam near the south end thereof, and of maintaining its attachments to it, are not now in issue. If the plaintiffs showed that they had acquired the right to the use of all the water in the upper dam, prior to 1825, then the question arises, whether the defendant has not, in the same way, that is, by prescription, since 1825, acquired the right to draw water from the upper dam through the bulk-head, or some kind of an opening, as he claims; and there is nothing about this right, in the proof necessary to maintain or to disprove it, which would prevent that question from being as properly and as fully tried at law as in equity.

Indeed, it would seem that if jury trials are to be had to settle any questions of fact, there would be a peculiar propriety in submitting to their decision questions like these, where the testimony must necessarily extend through long periods of time, where it is most likely to be conflicting and uncertain, where the acts of all parties, whether of aggression or acquiescence, through many years, and their claims and their admissions are all to be weighed, where the testimony is voluminous, and where the result is to be arrived at by balancing conflicting testimony, and weighing conflicting claims.

But Perkins claims still another right, that is, to draw two hundred and fourteen inches of water from any part of the upper dam, and by this bulk-head at the north end. There is nothing in the terms or character of this grant from Abraham Brown to Ephraim Fisk which makes that peculiarly a subject of equity jurisdiction. That deed can as well be construed in a court of law as of equity; in fact it is to be construed every where according to well established legal principles. "It is not the peculiar province of a court of equity to construe contracts and conveyances of water powers." *Fisk* v. *Wilber*, 7 Barb. S. C. 395. This deed conveys "a piece of land, with the building and water-power thereon, bounded," &c., "including in said water-power the privilege to draw two hundred and fourteen inches of water-power." Now it would seem, from the wording of that grant, that it limited the two hundred and fourteen inches to the water-power on the land as an existing privilege. But if it did not, but was an independent grant of so much water-power, giving the grantee the right to elect where he would draw it, is not

the right fixed by Fisk's having once elected where to take it? *Haven* v. *Cram*, 1 N. H. 94. But however that might be, upon the plan furnished us in this case, one of the mills at the south side of the river is marked and designated as "Perkins' clapboard-mill." It would seem evident that he can not draw this two hundred and fourteen inches of water at two different places at the same time, or at one place at one time, and at another place at another time, retaining the right to change back and forth at his pleasure. There is nothing in the case showing that Perkins has ever abandoned the right to draw this whole quantity of water from the south end of the dam, or that he is not now constantly drawing it there. So that, although a court of equity will look into the title, and examine the respective claims, if any are shown, and will give the proper construction to deeds, when necessary, still, as this case stands, Perkins is in no position here to claim his right to draw this two hundred and fourteen inches of water-power at the north end of the dam, so that this claim may be laid out of the case, here. But if there should be any questions of fact necessary to be considered in giving construction to this deed, or especially if there should be disputed facts, necessary to be settled in order to its proper construction, it would only tend to show the greater propriety of submitting these questions of fact, with all others in the case, to the consideration of a jury.

Only one act of the defendants is complained of—the opening of one space in the dam—and it is alleged that the defendants threaten to open it again, though the plaintiffs have closed it. It might be doubtful whether this one act would constitute more than a simple trespass; but it is claimed to be a case of a private nuisance, and as that is the most favorable light in which to view it for the plaintiffs, let us consider it as such, and see whether then this court will assume jurisdiction. It is said that courts of equity have a concurrent jurisdiction with courts of common law, in cases of private nuisance. This is true in a class of cases, and for certain purposes, but is not a truth of universal application. In *Attorney General* v. *Nicol*, 16 Ves. 338, Lord *Eldon* said, there were private nuisances which would support an action on the case, but which would not support an injunction. He put the jurisdiction of the court upon the ground of material injury, and of that special and troublesome mischief which required a preventive remedy as well as a compensation in damages. The interference of courts of equity to restrain such nuisances is founded upon the ground of restraining irreparable mischief, of suppressing interminable litigation, or of preventing a multiplicity of suits. 2 *Story Eq.* 925; Eden on Injunctions 286.

There is a jurisdiction in equity to enjoin an existing private nuisance, if the fact of the nuisance be admitted or established at law, whenever the nature of the injury is such that it can not be adequately compensated by damages, or it will occasion a constantly recurring grievance. Adams Equity 211.

We have already seen that in this case there is no foundation for an equitable jurisdiction on the ground of irreparable injury, nor is there any more foundation for it on the ground of suppressing inter-

minable litigation, or preventing a multiplicity of suits.    Equity jurisdiction is to be entertained when, upon the facts presented, there is danger of irreparable injury, or of damage of such a nature that adequate compensation can not be recovered at law, or where, the plaintiff having established his right, to decline the jurisdiction would subject him to oppressive and interminable litigation.    One suit between the parties to determine the rights of each can not be oppressive.    A trial of that kind must be had if the bill is entertained, and no more is required at law.    The multiplicity of suits and the vexatious litigation arise when the plaintiff, having established his right by one suit at law, is driven, by repetitions of the wrong, to bring a fresh suit for every fresh injury.    *Coe* v. *Lake Co.*, 37 N. H. 265.    So that equity will not ordinarily assume jurisdiction merely for the purpose of suppressing litigation and preventing suits, until the right has been established by one suit whenever that right is doubtful, and there is an attempt to repeat the wrong and to compel the plaintiff to bring a multiplicity of suits to redress these repeated wrongs.    There is no evidence before us tending to show danger of multiplicity of suits.    The only question is one of right: Does the defendant possess the right to draw water from the Burnham dam, which he asserts, and which the plaintiffs deny?

The only threat proved or pretended in this case, is to assert what the defendants claim as a right.    If the question of right were settled against them, there is no reason to believe the injury would ever be repeated.    Should the rights be settled in their favor, there would probably be no difficulty in adjusting those rights between the parties.    The parties evidently came here to have their rights at law settled, for there is nothing in the controversy now here but their legal rights; nor can there be any pretense that a single suit at law will not only settle the right, but if the plaintiffs' rights have been disturbed, they can recover full and adequate damages for all the wrongs they have suffered.

Ordinarily a court of equity will not take upon them to decide the fact that a nuisance exists, but will require that the party first establish his right at law.    There are exceptions to this rule, as where the right is admitted, or the facts are all admitted, so that the court can determine, from the admitted facts, whether it is a case of nuisance or not.    There could, of course, be no occasion for a trial at law in such a case.    So in some cases where a party has been long in the quiet and uninterrupted enjoyment of a right, another party will be restrained from interfering with that right, until he proves his right at law.

But it is said there is a class of cases involving an inquiry into the rights of the owners of water-power, where courts will exercise their equitable powers without driving parties to an action at law. But let us see if that class of cases stands upon any different grounds from other cases, and if so, what is the difference.    *Bardwell* v. *Annis*, 22 Pick. 353, is cited as a leading case in favor of this position, and was a case between persons claiming rights in the same water privilege.    It is there said, that "the proceeding in equity is peculiarly fitted to ascertain, settle and adjust the relative

rights and obligations of parties so situated, and to secure and enforce them, and that an action at law which could only look to the past, and inquire into the damages actually sustained, and for these could only award a sum of money, without protection for the future, would be neither adequate in its nature nor complete in its effect." *Bemis* v. *Upham*, 13 Pick. 171, is to the same effect. But in the first of these cases the right of all the parties was fixed and established by the deed conveying their several water-powers, each proprietor being entitled to draw what water would run through a certain number of gates of certain fixed dimensions; and it was alleged that some had drawn more water than their share, in which case a discovery was necessary, in order that it might be ascertained what water the defendants had used, and where, in the end, their rights would all be regulated and adjusted by a decree of the court. It was not a case where the right was in question.

So in the other case, *Bemis* v. *Upham*, the nuisance complained of had been decreed to be a nuisance to the plaintiff, in an action or proceeding at law, and this bill was filed for its abatement. On demurrer it was held that the bill could be maintained; that equity had a jurisdiction to abate nuisances, or to regulate them after the rights had been settled at law, and that the party was not compelled to resort to his statute remedy to abate the nuisance—a remedy peculiar to that State. So in the first case cited, the court say, "the complainants set forth that they are mill-owners; that, as annexed to their mills they had certain definite rights and privileges in the flow of the water, in certain quantities, to and from their respective mills, and that the defendants have certain definite rights in the same stream, but that the defendants have disturbed them in the enjoyment of their rights, &c.; and upon the evidence, and on examination of the deed under which they all held, the facts were found to be as stated. The rights of each and all were fixed by deed. The only thing to be done was to regulate the use. In both these cases, it will be observed that equity jurisdiction is conferred upon the court in that State, by express statute; but probably their statute does not confer any greater power in that respect, upon their court, than that which has usually been exercised in this State, by our courts, under the general provisions of our law.

*Ballou* v. *Hopkinton*, 4 Gray 324, stands substantially upon the same ground. There the bill alleged that the plaintiffs were owners of certain real estate, mills, and water privileges, for the manufacture of cotton goods, and that they were the owners, with others, of a certain reservoir, created by a dam upon Mill river, in said Hopkinton, &c., by means of which the waters of said river were kept in reserve, for their use in the dry season; that the defendants had threatened to draw off a part of this water, and were actually drawing it off, claiming that the plaintiffs had no right to keep it at its present height, whereby the plaintiffs would sustain great loss and damage when they should need the water the coming season. But the bill further alleged that the plaintiffs had the right to raise the water to its present height, and that the defendants had no right to let it off, &c. The defendants demurred to this bill, thereby

admitting all the facts stated in the bill.   The court held that they had jurisdiction of the case under their statute, and the plaintiffs' rights being admitted, one decree in equity would prevent a multiplicity of suits, and would regulate the respective rights of the plaintiffs; and the demurrer was overruled.   This case might perhaps have been put also upon the ground of preventing irreparable mischief.

If this was a case where it could clearly be seen, from the subject matter of the alleged injury, and the nature of the wrongs complained of, that such irreparable mischief may be wrought, there would be no doubt of the propriety of entertaining the bill.   In a case of that character the court will take cognizance of it, and, if the case requires it, direct a trial by jury, to try the plaintiffs' right, in the mean time restraining the defendants, by injunction, from all nefarious proceedings, and when the right is established making the injunction perpetual.   Story Eq., sec. 927; Coe v. Lake Co., 37 N. H. 264; Mohawk Bridge v. Utica Railroad, 6 Paige 563, where it is held that the court of chancery has jurisdiction to interfere by injunction to prevent the erection of a nuisance which will produce serious or irreparable damage; and, if the thing sought to be prohibited, is clearly a nuisance, and the complainant's right is not doubtful, the court will grant an injunction without waiting the result of a trial at law.   But where the thing sought to be restrained is not in itself a nuisance, but only something which may, according to circumstances, prove to be so, the court will not interfere until the matter has been tried at law.

The same rule is substantially laid down by Lord Brougham, Ch., in Earl of Ripen v. Hobarts, Cooper Select Cases 333, cited in the last case; so in Weller v. Sweaton, 1 Cox Cases 102, where it is said that in all such cases of alleged or pretended irremediable mischief or damage, an injunction may be issued, but that in all cases, in fact, in which doubt exists as to the legal right, a court of equity will compel the parties to go to trial at law without delay, either dissolving the injunction, or maintaining it until such trial has taken place, as the justice of the case and the interests to be affected by the determination appear to require.

So in Belknap v. Trimble, 3 Paige 601, where a motion was made to dismiss, on the ground that the plaintiff had not first established his right at law.   But the court say, " the complainants and those under whom they claim were, and for a long time had been, the owners of several mills which depended upon the waters of Great Pond for support, for a considerable part of the year, and upon the use of this water the principal value of their mill property depended. Under these circumstances the defendant undertook to control the use of the water in such a way as to prevent the using of the mills. To establish their rights at law each of these several mill-owners would be compelled to bring a separate suit against the defendant, leaving their mills to stand still in the mean time.   And even this multiplicity of suits would afford them no adequate remedy for their continually recurring damages during the suspension of their rights.   This is a sufficient answer to the objection, that the com-

plainants' bill should have been dismissed," &c., thus showing in that case that the mischief threatened would be irremediable, and not susceptible of being adequately compensated by damages, and such as, from its continuance and permanent mischief, must occasion a constantly recurring grievance, which could not otherwise be prevented; which are sufficient reasons for a court of equity exercising jurisdiction and granting the injunction. The case also shows that the complainants had been for twenty years and more in the undisturbed use and possession of the right.

*Webber* v. *Gage,* 39 N. H. 182, is a case of this kind. In *Belknap* v. *Trimble* it is also said that where several mill-owners have a common right to an artificial use of water for their respective mills, a court of chancery has jurisdiction so to regulate the common use of the water as to preserve the rights of each. That is, where the rights are established or admitted, the use may be regulated by a court of chancery. We have no occasion here to disapprove of this latter doctrine, as there is nothing to show that in this case there is any need of any such interference to regulate the use of water among those whose rights are not in controversy.

In *Arthur* v. *Case,* 1 Paige 447, it is said there is no doubt of the jurisdiction of the court in this case, as the new dam (the nuisance threatened) would in a great measure destroy the complainant's valuable mills, which have been in operation many years. If the owner of the mills on either side has been in the quiet enjoyment of the water privilege, and the other attempts to deprive him of it, and thus destroy his mills, a preliminary injunction is proper, as the injury might be irreparable. But upon looking into the answer in that case, which stated the defendant's right, it was found, by the grants and title there stated, that the parties were entitled to participate equally in the use of the water. There was no chance for any controversy about the rights, and the motion to dissolve the injunction was denied. The doctrine is there reiterated, that in such cases, where the rights are established, the court would regulate the use of the water so as to give each the proportion to which he was entitled.

*Olmstead* v. *Loomis,* 6 Barb. S. C. 152, was a petition for an injunction upon the defendant from diverting water from the plaintiff's mill, and setting forth that the plaintiff had the right to as much water from a certain dyke as was necessary to carry a forge and two blacksmith's bellows, and the defendant had the right to the remainder; and that the plaintiff's right had been admitted by all former owners of the defendant's privilege, but that the defendant had deepened the race running to his mill, so as to draw all the water when it was low, to the great injury of the plaintiff's mills. The bill also prayed that the rights of the parties might be decreed. The Supreme Court dismissed the bill, on the ground that there was no irreparable damage alleged in the bill as done or threatened, and that a court of equity would not interpose except in case of strong and imperious necessity, or the right must have been previously established at law. *Fisk* v. *Wilber,* 7 Barb. S. C. 395, was a similar case, decided by the same court upon the same ground.

In the Court of Appeals, 5 Seld. 423, the decision in *Olmstead* v.

*Loomis* is overruled; and the court say (*Ruggles*, J.), "In regard to the point on which the case turned in the court below, I am compelled to differ in opinion from that court. The bill was dismissed on the ground that the court of chancery had not concurrent jurisdiction with a court of law in a case like the present, and that no relief in equity could be granted until the right had been first settled at law. The right of the plaintiffs to use the quantity of water specified in the deed of 1802, for the purpose of driving their paper-mill, is entirely clear, especially when connected with the long and uninterrupted use of it for that purpose. The only real difficulty between the parties, after settling the construction of the deed, arises from the want of some satisfactory mode of determining, not only for the present but the future, what quantity of water the parties are respectively entitled to, and to fix it by actual measurement." "The true and proper remedy was in a court of chancery, and the mode by which the controversy can be determined with the least expense and the greatest certainty of doing justice, is by reference to one or more suitable referees, one of whom should be a capable engineer or mill-wright. This course of proceeding enables the court to exercise its power of preventing future litigation." He placed his opinion, as it would seem, upon the case of *Belknap* v. *Trimble*, that where there is a common right to the use of the water, which is not in dispute, that court might properly regulate this common use of the water so as to preserve the rights of each. But *Parker*, J., places the decision upon stronger grounds, and says, "It is well settled that courts of equity have concurrent jurisdiction with courts of law in cases of private nuisance of this character. The plaintiff need not set forth in the complaint all the reasons why an injunction should be granted. It is enough that it appears that the plaintiff's right is unquestionable, and has been recognized by ancient use and enjoyment, and that the diversion, being a recent act, has the effect to prevent the plaintiffs from carrying on business at their mills. It is not necessary to allege in terms that the threatened injury will be great or irreparable, if it is apparent from the facts set forth that such must be its effects. In such a case it is not necessary first to establish a right at law." He then quotes *Belknap* v. *Trimble*, and repeats the language there used in regard to regulating the common use where there is a common right. He thus places the decision, in the first instance, upon the ground that it was a case where irreparable injury or mischief was being done and threatened; that a temporary injunction should have been issued; and that then, upon examining the answer and finding that no question of fact was in controversy about the parties' rights, but only a controversy about whether each was actually using more or getting less than thus belonged to him, the use should have been regulated by the court so as to give to each his rights.

I find the same doctrines held in a recent case in Vermont, *Lyon* v. *McLaughlin*, 32 Vt. 423, where it was agreed that both parties had a right to the privilege of water contained in a certain dam; and the only question was as to the mode and means by which the defendant was entitled to take the water from the dam, which

water, it was conceded, he had a right to use. The right depended upon the construction of a deed under which the defendant held. It was held that a case of equitable jurisdiction was made in the bill, because, it being admitted that the parties had common rights in the water-privilege, equity might regulate and fix the extent of their respective rights as tenants in common, and also because the use which the defendant threatened and was intending to make of the water would have caused irreparable mischief to the plaintiff; and the injunction was granted.

We conclude, then, that there is no difference between the rights of the owners of mills and water-power and the rights of any other persons in any other property, so far as the jurisdiction of a court of equity is concerned, when these rights are interfered with or threatened by private nuisance, unless it may be (1) that any interference, either actual or threatened, with these rights, from their importance as connected with the great manufacturing and mechanical interests of the State and country, and from the manner in which mills and other similar improvements are usually and necessarily affected in value by affecting the supply of water-power, and the effect which any such interference has upon the business and profits of the owner, perhaps oftener produces irreparable mischief or threatens irremediable damage than an interference with other rights or classes of rights would be likely to do; and a court of equity would, on that ground, assume jurisdiction to grant injunction and decide the case oftener than in other classes of cases; and (2) that courts of equity have jurisdiction of that class of cases where there is an admitted common right among several owners of the same privilege, to regulate the common use, to determine the extent of their respective rights and the proper mode of exercising and enjoying them, as tending to prevent litigation, and as affording a more complete and perfect remedy than could be obtained at law, and as furnishing, in fact, the only adequate means of ascertaining and determining the respective rights of the parties. *Lyon* v. *McLaughlin, supra.*

But these principles have no application to the present case, because here the plaintiffs, instead of admitting the defendants' right, or that they have any right in common with them in the Burnham dam, or the water in the same, deny such right altogether; and while the defendants claim a right to draw water from it through a bulk-head, yet that right has never been established by the defendants at law, nor has the plaintiffs' right to the whole water in that dam been settled at law; and the primary question here is, whether the defendants have any right in common with the plaintiffs to draw water from the Burnham dam. Nor do the plaintiffs seek any adjustment of their common rights, for they deny that the defendants have any right in common with them to be adjusted; and a court of equity will not assume jurisdiction of a case under any pretense of adjusting rights in common to water-power, when it is perfectly apparent that all that is sought or needed by the parties, or either of them, is the settling and establishing of a disputed right, which depends entirely upon the application of legal princi-

ples, and where, from the character of the right in question, and the evidence upon which it must be established, it is evidently a case peculiarly appropriate for the consideration of a jury, and for a decision in a court of law.

In a case where no irreparable damage or mischief is done or threatened; where no multiplicity of suits is to be avoided, or any interminable or oppressive litigation prevented; where there can probably be no need of any injunction upon either party, when their legal rights are once established; and where as yet there has been so little occasion for a temporary injunction that none has ever been asked for; there would seem to be no good reason why the court should retain the case until the right at law shall be settled, or why any issue should be sent to the jury to determine the right at law, upon any sound principle of equity jurisdiction or equity practice.

We can see no reason why a court of equity should entertain jurisdiction to grant an injunction in this case, any more than in a case of ordinary trespass to real estate, which is never done where adequate compensation can be obtained in an action at law; 2 Story Eq., sec. 928; though, under our present practice, courts of equity will grant injunctions in cases of timber, ornamental trees, monuments, coal, ores, and quarries, where the party is a mere trespasser, or where he exceeds the limited rights with which he is clothed, upon the ground that the acts are or may be an irreparable damage to that particular species of property. 2 Story Eq., sec. 929; *Smith* v. *Pettingill*, 15 Vt. 82; *Jerome* v. *Ross*, 7 Johns. Ch. 315.

But even treating it as a case of private nuisance, this case stands no better. The obtaining of redress for past injury, or relief from future mischief, on account of an alleged nuisance, as the direct and primary object of the bill, is not of itself a branch of equity jurisprudence. *Coe* v. *Lake Co., supra.* It must be a strong and mischievous case of pressing necessity, or the right must have been previously established at law, to entitle the party to call to his aid the jurisdiction of a court of equity. *Van Bergen* v. *Van Bergen*, 3 Johns. Ch. 282. Courts of equity will, as a general rule, interfere in those cases of private nuisance only, where the right of the party claiming is clearly established, and the injury which he must necessarily sustain, if the work be allowed to proceed, is of such a nature that no adequate compensation can be afforded by damages only. Ang. on Water-Courses, sec. 444. The jurisdiction of chancery, though said to be concurrent with courts of law in cases of private nuisance, will ordinarily be exercised only in aid of the common law courts, and is designed to prevent immediate and irreparable injury, and to preserve the subject matter of controversy from destruction until the right can be settled. When the right is fully settled at law a bill may be sustained fully to carry into effect the judgment, and thereby prevent endless controversy. But a court of chancery will never sustain a bill in such case, to adjudge and settle the legal rights of the parties to a water-course, when in dispute. That must be done by a court of law, or by a long, uninter-

rupted and undisputed user. *Prentiss* v. *Larnard*, 11 Vt. 135. To the same effect is 3 Dan. Ch. 1859, 1860, and cases cited; Adams Eq. 211, and cases cited; *White* v. *Booth*, 7 Vt. 131; *Hart* v. *Mayor of Albany*, 3 Paige 213; *Reid* v. *Gifford*, 6 Johns. Ch. 19; Eden on Injunctions 274, and cases cited; *Porter* v. *Witham*, 17 Me. 292; *Russ* v. *Wilson*, 22 Me. 211.

The case of *Coe* v. *Lake Co.*, before cited from our own reports, is broad enough in its principles to cover the present one; and if the law of that case is to be sustained, we think it must be decisive of this. That is evidently a well-considered opinion. We think its legal positions are sound, and we see no occasion to depart from them. The bill is therefore

*Dismissed with costs.*