WILDER v. CLOUGH.                    { MARCH 12,
                                        1875.

Where it appeared that A & B raised the water by their dam so as to flow
  the land of A above—*Held*, that this was not an adverse user.

┤ TRESPASS, by Wilder & Co. against Levi Clough, for flowing the
plaintiffs' land and throwing back-water upon it, and injuring the
plaintiffs' mills, filling up his raceway and impeding his wheels, &c.
Writ dated March 30, 1872.

The plaintiffs owned and occupied a mill-dam and privilege on Squam
river in Ashland, and the defendant owned and occupied another mill,
dam, and privilege on the same river, immediately below that of the
plaintiffs.    In the year 1847, one Joseph Shepard owned the land and
privilege which the plaintiffs now own, but there was no mill or dam on
it at that time; and one Nathaniel M. Shaw owned the lower privilege
and land which the defendant now owns, and a dam had been built on
that privilege before that date.    On September 22, 1847, said Shepard
and Shaw agreed upon a division of their land and water-power, and
gave deeds to each other.    The description of the land in Shepard's
deed to Shaw was as follows: " All my right, title, and interest
in, of, and unto Squam river in Holderness aforesaid, below a line
extending across said river from an ash tree marked, being the south-
east corner of a tract of land which the said Shaw and Aaron M.
Gordon bought of Moses Merrill, in a direct line with the east side
line of said tract so bought of Moses Merrill, including all the rights
in said Squam river below said line across the same which I reserved
in a deed from me to Aquilla D. Eastman, dated 4th Dec'r, A. D. 1830.
Recorded Lib. 127, Fol'o, 71.    Also, all my right to a strip of land
three rods wide below said line so extending across said river men-
tioned in said deed to Eastman, excepting a part of said strip de-
scribed as follows: Beginning at low water mark on the southerly side
of said river, at a point in the said line across said river; thence
running southerly in a continuation of the said line across said river
three rods; thence westerly down said river, keeping three rods from
low water mark of said river, three rods; thence northerly and paral-
lel with the first mentioned line to low water mark in the river; thence
up the river by low water mark to the bounds first mentioned: said
Shaw to have the privilege of flowing said tract up to the said Ash
tree."

The description of the land in Shaw's deed to Shepard was as fol-
lows: "All my right, title, and interest in, of, and unto a certain tract
of land situated in Holderness aforesaid, described as follows, viz., a
strip of land four rods wide on the southerly side of Squam river,
bounded northerly by the low water mark in said river, southerly by
a line parallel to said first line, keeping four rods from the same,
westerly by a line three rods down the river from a line drawn across
said river in continuation of the east side line of land which said

Shaw and Aaron M. Gordon bought of Moses Merrill (the boundary at the river on said east side line being an ash tree marked), easterly by a line four rods long connecting the said southerly and northerly side lines at a point in the first bend of the river above the said ash tree at low water mark on the south side of said river, meaning the most southerly point in said bend : the easterly and westerly side lines of this strip are to run the same point of compass as the said easterly side line of land bought by said Shaw and Gordon of Moses Merrill, excepting the right of flowing said tract below said ash tree.   Also, all my right in the bed of said Squam river above said ash tree."

The line as fixed by these deeds continues to be the limit of the different water privileges to the present time.

The ash tree stood upon the northerly bank of said river: whether it stood upon the edge of the bank next to the water, or three or four feet farther north, was in dispute.   The strips of land reserved in the deeds were on the south side of the river, and in going back three rods from the river, the land would rise ten feet or more above the level of the river.

The defendant asked the court to instruct the jury that " under the deed of 1847, from Shepard to Shaw, the defendant has the right to flow the water up to the body of the ash tree, at the lowest point where it comes in contact with the ground, as it then was," which the court declined to do, but did instruct the jury that " the height to which the defendant can flow is a line across the river at the ash tree upon the surface of the water at its ordinary height, at or about the time said deed was given ; and that the jury might take the law to be that this line thus going across the river gives the parties, above and below, the same rights that they would have if bounded on this line in the ordinary way ; and that if the defendant, by means of his dam, flowed or raised the water on the plaintiffs' side of the line to any appreciable extent, the defendant would be liable ;" to all which the defendant excepted.

It appeared that one George W. Mitchell owned the upper privilege and land now owned by the plaintiffs, from the year 1854 to 1864, and that he owned one half of the lower mill, dam, and privilege in common with said Shaw and others, from 1855 to 1862; that after said Mitchell bought into the lower privilege, he and said Shaw rebuilt the dam on that privilege, and up to this time no use was made of the upper privilege, but that afterwards said Mitchell built a stone dam upon his upper privilege.   The defendant claimed the right to hold the water to a certain height by prescription ; but the court instructed the jury that upon the facts as stated, no prescriptive right could be acquired by the defendant since 1847, it appearing that said Mitchell was actually engaged in building the dam of 1855, and in doing all the business that was done upon his lower privilege from 1855 to 1862 ; and the defendant excepted.

Verdict for the plaintiffs, which the defendant moved to set aside.

*Burrows, Blair,* and *H. Bingham,* for the plaintiffs.

*Barnard, Pike & Blodgett,* and *Wilson,* for the defendant.

CUSHING, C. J.   The deed under which the defendant claims contains these words: "said Shaw to have the privilege of flowing said tract up to the said ash tree."

The Squam river runs in a direction nearly west at this place towards the Merrimack.   There are upon it two mill privileges,—one owned by the plaintiffs, and one owned by the defendant,—the defendant claiming under the above mentioned deed from Shepard to Shaw, and the plaintiffs claiming under a deed from Shaw to Shepard.   The dividing line between the two privileges, as fixed by these deeds, was a continuation of the east side line of the tract of land north of the Squam river, purchased by Shaw of Gordon and Merrill, and passing by an ash tree at or near the bank of the river at the south-east corner of said tract.   It appears from the deeds that the parties, Shaw and Shepard, each had or claimed to have some rights in a strip of land on the south bank of the river.   The defendant claims the right to flow so as to raise the water as high as the bottom of the ash tree. The plaintiffs claim, and the court below held, that his right to raise the water was limited by the line fixed upon as the dividing line between the privileges, and that the defendant could not rightfully, by means of his dam, flow or raise the water on the plaintiffs' side of the line.

By the deed of Shepard, all his rights in and to the Squam river below that line are conveyed to Shaw.   The deed next conveys all the grantor's right to a strip of land three rods wide south of the river, excepting a strip three rods wide extending towards the west down the river three rods; and this tract, so reserved, the said Shaw is to have the privilege of flowing up to the ash tree.

Shaw, by his deed, conveys to Shepard all his rights in a strip of land four rods wide, extending three rods down the river on the same boundary line, and also a little above the line; so that in point of fact Shaw covers by his deed the very same strip of land south of the Squam river which Shepard conveys to Shaw, and Shaw reserves the right of flowing said tract below said ash tree.   It is plain that these portions of the two deeds cover the same strip of ground, giving the ownership of the soil to Shepard and the right of flowing to Shaw; and it is plain that exactly the same right of flowing is granted by Shepard's deed to Shaw by the words "up to the ash tree," as is reserved in Shaw's deed to Shepard by the words "below the ash tree." Shaw's deed also grants all his right in the bed of the Squam river above said ash tree, which, according to the defendant's construction, would put the bed of the Squam river somewhere vertically above the ash tree.

By these deeds the east line of the Gordon and Merrill lot was made the boundary line between the two privileges, Shaw getting that part

of the bed of the stream which was situated below, *i. e.*, west of the line drawn through the ash tree, and Shepard getting that part of the river east, *i. e.*, above the line drawn through the ash tree. Shepard got the ownership of a strip of land three rods wide in his deed and four rods wide in Shaw's, and Shaw got the right to flow that strip of land as far up as he got the right to set back the water in the bed of the stream, that is, below and as far up as the same line.

It does not appear that the vertical height of this boundary line is concerned at all in the matter. The defendant's right to raise the surface of the water, or to cause it to set back, is limited by that line. If he could always raise the water as high vertically as the foot of the ash tree, he would in time of low water set the water back on to the plaintiffs' privilege, and might materially interfere with it. So, if he were limited not to go above that line vertically in time of ordinary high water, his privilege might be materially curtailed. What he gets by these conveyances is, the right to change the level of the stream as far east as that line, so as to make it below that line nearly on a level with the water at his dam, and that whether at low, medium, or ordinary high water, and he gets a corresponding right to cover with water the strip of land south of the river.

Suppose that the water in the Squam river, at the point where the line crosses it, were at its deepest point two feet deep, and the defendant's dam were so constructed as at ordinary flow of water not to alter that level : if in time of low water the defendant should so arrange his dam as to keep the water at a depth of two feet, it is obvious that he would flow back the water on to the plaintiffs' privilege and interfere with the operation of their mill, so that if this were the criterion the plaintiffs might be materially injured,—while, on the contrary, if in times of high water the defendant could not raise the water at that point above that line, he might lose the whole of his privilege.

As it appears by the case that the defendant's grantor occupied both privileges within twenty years next before the date of the writ, there could be no adverse user for twenty years, and of course no right could be gained. *Odiorne* v. *Lyford*, 9 N. H. 502; *Burnham* v. *Kempton*, 44 N. H. 78; *Gilman* v. *Tilton*, 5 N. H. 231; Angell on Watercourses, sec. 340.

LADD, J. 1. I think it is impossible to entertain a doubt as to the construction of the deed from Shepard to Shaw. It conveys all the grantor's rights in the river below a line extending across the same from the ash tree, and the right of flowing a certain described tract of land up to the tree. The defendant's contention is, that this means the right to raise the water in perpendicular height up to the body of the tree. It seems to me that would be nothing less than a most extraordinary perversion of language which, of itself, is entirely plain and unambiguous. It is certainly difficult to imagine what terms could have been used to indicate that the grantee's right of flowage should be bounded by a line crossing the river at the ash tree, if these do not.

The instructions on this point were in accordance with this view, and were correct.

2. There can be no doubt of the soundness of the general proposition as to flowage given to the jury. No riparian proprietor has a right to throw the water of a stream back upon the proprietors above. But it is said this general proposition should have been qualified by going into an explanation of the doctrines to be applied when the question between two shore owners is one of a reasonable use of the water, and further, by an explanation of how it would be in times of freshet, floods, accumulation of ice, &c. The short and complete answer to this is, there is nothing in the case to show that either of these qualifications was called for by the facts; and further, if they were supposed by the defendant to be germane and necessary, there should have been a special request to that purpose.

3. There was clearly no evidence of a right gained by twenty years' adverse user.

SMITH, J. The instructions of the court, in regard to the height to which the defendant could flow, were correct. The deed from Shepard to Shaw, of September 22, 1847, conveys all his right to the river below a line extending across the river from the ash tree, including all his rights below said line, which he reserved in his deed to Eastman, dated December 4, 1830. The strip three rods wide, included in Shepard's deed to Shaw, reserves a strip below said line, and grants to Shaw the privilege of flowing " up to the ash tree." The deed from Shaw to Shepard, dated September 22, 1847, conveys to Shepard the strip four rods wide on the south side of the river, reserving " the right of flowing said tract below said ash tree ; " and also conveys " all his right in the bed of the river above the ash tree." Construing these deeds together, as they must be, I think it clearly indicates that the intention of the parties was, to bound their respective rights of flowage by this line ; that Shepard conveyed all his right below that line ; and that Shaw acquired no right to flow above that line.

If the construction contended for by the defendant is the true one, he could flow up to the body of the tree, and of course as far up the river as would bring the level of the water to a line projected horizontally from the foot of the tree, and thus use the fall of the river above. An examination of the language of the deeds is conclusive that such was not the intention of the parties, and it would leave the upper mill privilege comparatively worthless.

The defendant could acquire no right to flow by prescription. Mitchell owned both privileges, and the lower one in common with Shaw from 1855 to 1862. Both parties claim under him. From 1855 to 1862, Shaw and Mitchell could gain no right by adverse possession against Mitchell ; and if Shaw at any time began to acquire such right after 1862, it could not ripen into an absolute right within less than twenty years, which have not yet expired.

The defendant also objected to the instruction that if he, " by means

of his dam, flowed or raised the water on the plaintiffs' side of the line to any appreciable extent, the defendant would be liable,"—because, as he claims, it makes him " liable for freshets, floods, accumulations of ice, and every other visitation of providence which might produce an extraordinary and unnatural rise in the stream ;"—but I think this result does not follow. The instruction was, that he would be liable if he should flow above the line " by means of his dam," and not by means of freshets, &c. The construction must mean, the river in its ordinary and usual stages, and not at unusual and exceptional times, when swollen by freshets and clogged by ice.

Exceptions overruled, and

*Judgment on the verdict.*